# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

_____

SHAWN A. KEYS,

        **Plaintiff,**

        **-vs-**                                    **Case No.    04-C-1010**

KIM STASKAL,

        **Defendant.**

_____

## DECISION AND ORDER
_____

        The plaintiff, Shawn A. Keys, who is incarcerated at the Redgranite Correctional Institution, filed this *pro se* civil rights complaint pursuant to 42 U.S.C. § 1983. The court granted Keys' petition to proceed *in forma pauperis* on his due process and retaliation claims under §1983. Specifically, the plaintiff alleges that the defendant, while acting as his probation officer, altered his custody status and interfered with his ability to seek medical attention after she was informed that he intended to file a personal injury lawsuit in which she may be named as a defendant. The defendant has filed a motion for summary judgment on a number of grounds. The motion will be granted.

### STANDARD FOR SUMMARY JUDGMENT

        Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there

is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial-(1) the absence of a genuine issue of material fact, and (2) an entitlement to judgment as a matter of law-is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Anderson*, 477 U.S. at 267; *see also, Celotex Corp.* 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleading themselves . . ."); Fed. R. Civ. P. 56(e) ("When a summary judgment motion is made and supported as provided in [Rule 56(c)], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's

case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322 (emphasis added).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989). "However, we are not required to draw every conceivable inference from the record – only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted).

In compliance with Civil Local Rule 56.2(a), the defendant – the movant – filed proposed findings of fact which identified those facts upon which there is no genuine issue. The defendant cited evidentiary material to support her factual propositions. The plaintiff filed a response to the defendant's proposed factual findings. However, his response was deficient under Civil Local Rule 56.2(b) as it merely identified nine areas in which the plaintiff believed there was a genuine issue of material fact. The plaintiff's response failed to refer to any of the defendant's proposed findings of fact by paragraph number nor did it include any citation to evidentiary materials in the record to support his claim that a dispute exists. *See* Civ. L.R. 56.2(b)(1). Further, the plaintiff did not file any additional factual propositions as he was permitted to do under Civil Local Rule 56.2(b)(2).

The consequences for the failure of the nonmovant to submit an appropriate response to a movant's proposed finding of fact is clear under Civil Local Rule 56.2(e): the Court must conclude that there is no genuine material issue to that factual finding. A review of the

3

record reveals that the plaintiff received notice of the summary judgment procedures and the consequences for failing to follow them as required under Civil Local Rule 56.1. Accordingly, because the plaintiff has not contested any of the factual findings propounded by the defendant as contemplated under Civil Local Rule 56.2, I find that the facts, as identified by the defendant in her proposed findings of fact, are undisputed. *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921-922 (7th Cir. 1994) ("We have . . . repeatedly upheld the strict enforcement of [local rules regarding summary judgment obligations], sustaining the entry of summary judgment when the nonmovant has failed to submit a factual statement in the form called for by the pertinent rule and thereby conceded the movant's version of the facts.").

Based on the above, the undisputed facts are as follows. On July 26, 2000, plaintiff, Shawn Keys, was convicted of two counts of 1st Degree Sexual Assault of a child, contrary to Wis. Stat. §948.02(1). (Defendant's Proposed Findings of Fact ["DPFF"] at ¶ 1.) Keys was sentenced on March 6, 2001, to seven years in the Wisconsin State Prison System and ten years of extended supervision on each count. (DPFF at ¶ 2.) This sentence was to run concurrently and was stayed. (Id.) Keys was placed on ten years of probation for both counts. (Id.) As a condition of probation, he was required to serve one year in the House of Corrections beginning April 2, 2001. (Id.)

Defendant, Kimberly Staskal, is employed by the Wisconsin Department of Corrections as a "Probation/Parole Agent" in Appleton, Wisconsin. (DPFF at ¶ 3.) In this position, her duties include, but are not limited to providing services to protect the public by

4

holding offenders accountable for their behavior, preparing case plans for offenders, fostering law abiding behavior and positive participation of individual offenders in the community, and preparing accurate and timely investigations, reports and case records. (DPFF at ¶ 4.) Staskal was Key's probation officer from about December 18, 2001 to January 22, 2003. (DPFF at ¶ 5.) Keys' probation included specific conditions that he acknowledged and signed on April 25, 2001, including the following: (1) having a pre-approved residence; (2) having no contact with Tameka Hawkins, her children or with any minors; (3) having no romantic relationships without approval; and (4) reporting to his probation agent once a week. (DPFF at ¶ 6.)

On May 17, 2002, Keys was approved to live with Mala Scott and her son Jason Scott at 5142 North 72nd Street in Milwaukee, Wisconsin. (DPFF at ¶ 7.) Staskal was not able to verify that Keys was living at the Scott residence on a regular basis. (DPFF at ¶ 8.) Therefore, on or about June 18, 2002, Keys was taken into custody on a probation hold and placed in the Milwaukee Secure Detention Facility ("MSDF") for violating a condition of his probation – failing to find appropriate housing. (Id.) In Keys case, "appropriate housing" means that a residence assessment has been performed by the probation agent and that such residence does not include any minors, is not located near a school, park or daycare, and does not contain any weapons or alcohol. (Id.) Keys also violated the conditions of his probation by failing to report to Staskal and by getting involved in a romantic relationship with a woman without Staskal's approval. (Id.) As of June 18, 2002, Keys violated the conditions of his probation approximately four times. (Id.)

5

A violation investigation report was completed by Staskal on June 24, 2002, and the next day Keys provided a statement regarding the violations. (DPFF at ¶ 9.) On June 25, 2002, it was decided by Staskal and her supervisor, Melissa Roberts Charles, that Keys would be released pursuant to a Release Contract. A Release Contract consists of additional rules added onto an offender's initial rules of probation. (DPFF at ¶10.) On June 27, 2002, Keys signed the contract in which he agreed to abide by a curfew of 8:00 p.m. and to have no contact with Tameka Hawkins or Linda Gynette. (Id.)

Keys was released to the Mala Scott residence on June 28, 2002. (DPFF at ¶ 11.) On July 3, 2002, Keys reported to Staskal as required and signed the new probation rules. (DPFF at ¶ 12.) At this meeting, Keys assured Staskal that he was still living in the approved Scott residence. (Id.) On July 9, 2002, Mala Scott notified Staskal that she had not seen Keys in a couple of days and did not want Keys to live with her anymore. (DPFF at ¶ 13.) However, that same day, Keys reported to Staskal that he was still residing at the Scott residence. (DPFF at ¶ 14.) On July 11, 2002, Staskal and her supervisor decided to meet with Keys based on reports that he was not staying at his approved residence and was lying about his whereabouts. (DPFF at ¶ 15.)

Staskal received a telephone call from Jason Scott on July 17, 2002, in which he stated that he had not seen Keys since June 28, 2002, and that Keys did not have any clothes at the Scott residence or a key to the residence. (DPFF at ¶ 16.) On July 18, 2002, Staskal received

6

additional information from a voice mail left by Keys which supported her suspicion that Keys was not, in fact, staying at the approved residence. (DPFF at ¶ 17.)

Keys notified Staskal on July 19, 2002, that he would not be able to report to her as scheduled. (DPFF at ¶ 18.) He received a verbal warning for missing his appointment and was told to report on July 23, 2002. (Id.) Keys again failed to report to Staskal on July 23, 2002, and he explained his absence on the fact that he had gotten a job. (DPFF at ¶ 19.)

On July 23, 2002, Staskal informed her supervisor that Keys was continuing to violate the conditions of his probation in the following ways: (1) failing to report for scheduled home and office visits; (2) failing to reside at his approved residence; (3) failing to notify Staskal of his whereabouts and activities; and (4) failing to give her the information of his employer so she could verify his employment. (DPFF at ¶ 20.) It was decided that an apprehension request would be issued to ensure that Keys was following the terms of his probation. (Id.)

Keys reported to Staskal's office on July 24, 2002, where he was advised that he was going to be taken into custody that day for violating the terms of his probation. (DPFF at ¶ 21.) He was then taken into custody. (Id.)

Later that day, Staskal and Agent Emily Kerr were transporting Keys and another offender to the Milwaukee County Jail by van. (DPFF at ¶ 22.) Both offenders were handcuffed and in seatbelts in the backseat of the van. (DPFF at ¶ 23.) Agent Kerr was driving and Staskal was in the front passenger seat. (DPFF at ¶24.) Their van slid into another van in the intersection of Holton Street and Capital Avenue. (Id.) They struck the other van on the front passenger side

7

by the wheel. (Id.) Agent Kerr and Staskal were not injured but their van had a slight dent in the license plate. (Id.) The other van was not damaged. (Id.) However, the offenders in the backseat of the van, one of which was Keys, complained of neck injuries and inability to move. (DPFF at ¶ 25.) Because of their complaints, they were released from custody and transported to a hospital by a fire and rescue vehicle which happened to be passing by. (DPFF at ¶¶ 25 and 26.)

On July 31, 2002, Keys reported to Staskal as required and informed her that he had retained a lawyer to represent him concerning the July 24, 2002, accident. (DPFF at ¶ 26.) Keys also informed her that he did not have a job. (Id.) Staskal reminded Keys that he had violated the conditions of his probation and would be going into custody on August 1, 2002, as explained to him prior to the accident. (Id.) Keys was taken into custody on August 1, 2002, and transported to the Milwaukee County Jail. (DPFF at ¶ 27.)

Staskal's supervisors decided to offer Keys an Alternative to Revocation ("ATR") on August 7, 2002, which would require that he obtain an appropriate residence and place him on the Electronic Monitoring Program ("EMP"). (DPFF at ¶ 28.) Keys agreed to these requirements. (Id.) Keys signed the ATR agreement on August 8, 2002. (DPFF at ¶ 31.) On this date, Staskal also approved Keys' new residence located at 9852 West Fond du Lac Avenue, Apartment #4 in Milwaukee, Wisconsin with the contingency that the residents put in another phone line to install the EMP. (DPFF at ¶ 29.) The residents agreed to the contingency. (Id.)

8

The electronic bracelet is used to track Keys' movement. (DPFF at ¶ 30.) If he is not in the residence during the scheduled time a signal will be sent via the telephone to the EMP monitoring center in Madison, Wisconsin. (Id.) While on EMP, Keys had a schedule set by Staskal which designated hours in which he had to be in the residence and hours in which he could be out looking for employment, going to church, shopping or in any other way dealing with his daily needs. (DPFF at ¶ 33.)

Keys was released to the approved residence on August 13, 2002, and was then hooked up to the EMP. (DPFF at ¶ 32.) He was not allowed to leave his residence on August 13, 2002, but starting August 14, 2002, he was permitted to go out on weekdays from 8:00 a.m. until 1:00 p.m. (DPFF at ¶ 34.) He was not allowed to leave his residence on the weekends. (Id.) Keys left his residence on August 13, 2002, and the EMP center was notified. (DPFF at ¶ 35.)

On August 16, 2002, Keys failed to meet with Staskal as required and did not return home until 1:23 p.m. (DPFF at ¶ 37.) Staskal was contacted by the EMP center that Keys had been tardy in returning home. (Id.) Keys asked Staskal on August 23, 2002, to approve his grandmother's house as his residence. (DPFF at ¶ 38.) Staskal had intended to approve the residence until she was notified by Keys' mother that the arrangement would not be appropriate. (Id.) Instead, Staskal agreed to allow Keys to live with his parents on a temporary basis. (Id.)

9

The telephone at his parents' house was not hooked up for the EMP until August 30, 2002, notwithstanding Staskal's warning that it be hooked up no later than August 26, 2002. (DPFF at ¶¶ 39 and 40.)

On September 2, 2002, Keys informed Staskal that he had gotten a job and, as a result, would need his EMP schedule to be changed to allow him to be out from 6:00 a.m. to 6:00 p.m. (DPFF at ¶ 41.) Staskal failed to report to Staskal as required on September 5, 2002. (DPFF at ¶ 42.)

Staskal was contacted by Crown Services, Key's temporary job agency, on September 6, 2002, and she agreed to their request that she "work around" Keys' work schedule. (DPFF at ¶ 43.) That same day, Staskal and her supervisor met with Keys and warned him that if he did not go to work he needed to contact Staskal. (DPFF at ¶ 44.) Keys reported that he had been fired by Crown Services that day for missing days of work. (Id.)

On September 30, 2002, Keys was given "time out" of EMP until 7:00 p.m. to go to a doctor appointment. (DPFF at ¶ 47.) Staskal was advised by the doctor's office that Keys had cancelled the appointment and rescheduled it to October 1, 2002. (Id.) Keys requested more "time out" on October 1, 2002, for a doctor's appointment he had on October 2, 2002. (DPFF at ¶ 48.) He informed Staskal that he had a doctor's excuse for his September 30, 2002, appointment but when he reported to Staskal on October 3, 2002, he did not have one. (DPFF at ¶¶ 48 and 50.) Keys also returned home late from his October 2, 2002, doctor's appointment.

10

(DPFF at ¶ 49.) Staskal was unable to verify what Keys was actually doing during his "time out." (DPFF at ¶ 50.)

Thereafter, Staskal and her supervisor decided to take Keys into custody for lying to Staskal about his whereabouts and for violating his EMP schedule and to proceed with proceedings to revoke his probation. (DPFF at ¶¶ 50 and 51.) At this point in time, Keys had violated the conditions of his probation approximately 15 times. (DPFF at ¶ 50.) Keys was served with revocation papers at MSDF on October 10, 2002, and his revocation was completed by January 22, 2003. (DPFF at ¶ 52.)

Staskal's decision to change Keys' custody was not related to the July 24, 2002, accident but was based on his continuous violations of the conditions of his probation and his ATR. (DPFF at ¶¶ 56 - 58.)

## ANALYSIS

The defendant contends that the undisputed facts show that she is entitled to judgment as a matter of law under four distinct theories: (1) that the plaintiff's action is barred by the United States Supreme Court's decision in *Heck v. Humprey*, 512 U.S. 477 (1994); (2) that her actions are protected by the principles of absolute judicial immunity; (3) that she did not retaliate against the plaintiff; and (4) that she is entitled to qualified immunity. The plaintiff's claims will be disposed of under the first and third theories.

Staskal argues that the plaintiff 's due process and retaliation claims stemming from his allegations that she retaliated against him by altering his custody status were improperly

11

Case 2:04-cv-01010-RTR    Filed 11/01/05    Page 11 of 14    Document 33

brought under 42 U.S.C. § 1983. She contends that these claims are ones attacking the fact or duration of his confinement and should have been brought as a petition for habeas corpus relief under 28 U.S.C. §2254. The plaintiff asserts that the defendant's argument is without merit because he is only seeking monetary damages and not release from his current confinement.

"When a plaintiff files a §1983 action that cannot be resolved without inquiring into the validity of the confinement, the court should dismiss the suit without prejudice." *Copus v. City of Edgerton*, 96 F.3d 1038, 1039 (7th Cir. 1996) (per curiam) (*citing Heck*, 512 U.S. 477.) In assessing whether a claim brought under §1983 involves issues cognizable in habeas corpus, it is essential to determine whether the conduct complained of had an effect on custody; if not, the damages action under §1983 can proceed. *Id.* "[A] state prisoner's §1983 action is barred (absent prior invalidation) – no matter the relief sought (damages or equitable relief), . . . – if success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson v. Dotson*, ___ U.S. ___, 125 S. Ct. 1242, 1248 (2005).

In the instant case, the plaintiff is challenging the motivation behind the defendant's decision to initiate probation revocation proceedings which resulted in his current confinement. He claims that her decision to initiate the probation revocation proceedings was unwarranted and based solely on her desire to retaliate against him for pursuing a personal injury lawsuit in which she may be named as a defendant. Success on this claim means a finding that the entire revocation process was invalid and that the defendant's current confinement is improper. Thus, the proper method for challenging the defendant's conduct in this case is a habeas corpus petition

12

under 28 U.S.C. § 2254 but only after the plaintiff has exhausted his remedies through the state courts. Therefore, the plaintiff's motion for summary judgment will be granted as to these due process and retaliation claims, and such claims will be dismissed, without prejudice.

The plaintiff's retaliation claim that Staskal used her office to intimidate him from seeking medical attention and counsel in connection with the injuries he sustained as a result of the July 24, 2002, car accident does not involve issues cognizable in habeas corpus. Nevertheless, this claim will be dismissed as it has no factual basis in the record.

A plaintiff has the burden to prove three elements in order to succeed on a claim for retaliation: he must "specif[y] a retaliatory action;" he must name the appropriate defendant(s); and he must "assert[] a constitutionally protected activity, the exercise of which caused the . . . retaliatory action." *Hoskins v. Lenear*, 395 F.3d 372, 375 (7th Cir. 2005).

Here, the plaintiff fails to prove the first element of his retaliation claim. The plaintiff has not identified any evidence which shows that Staskal interfered in his ability to seek medical attention much less that such action had a retaliatory motive. Indeed, the record shows that Keys met with doctors on at least two occasions after he had notified Staskal that he contemplated filing a personal injury lawsuit. (DPFF at ¶47-49.) There is no evidence in the record showing that Staskal interfered with these appointments or with any other medical treatment sought by the plaintiff. Also lacking from the record is proof that the defendant interfered with the plaintiff's efforts to obtain counsel to represent him in his contemplated lawsuit. Because he has failed to meet his burden of proof on an essential element of his claim,

13

the plaintiff's motion for summary judgment will be granted on this claim and it will be dismissed, with prejudice.

## ORDER

**IT IS THEREFORE ORDERED** that the defendant's motion for summary judgment (docket # 20) is **granted**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment dismissing the plaintiff's claims and this action in accordance with this decision and order.

Dated at Milwaukee, Wisconsin, this 1st day of November, 2005.

**SO ORDERED,**


s/ Rudolph T. Randa
**HON. RUDOLPH T. RANDA**
**Chief Judge**

14